ACCEPTED
06-12-00141-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
3/4/2015 4:39:26 PM
DEBBIE AUTREY
CLERK

## NO. 06 – 12 – 00141 – CR

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
3/5/2015 12:18:00 PM
DEBBIE AUTREY
~~Clerk~~

## IN THE SIXTH DISTRICT COURT OF APPEALS
## TEXARKANA, TEXAS

## SYLVESTER KELLY

### Appellant,

### v.

## THE STATE OF TEXAS

### Appellee

On appeal from the 188TH District Court, Gregg County, Texas
Trial Court Case No. 41,078-A

## BRIEF OF THE STATE OF TEXAS

**– ORAL ARGUMENT NOT REQUESTED –**

CARL DORROUGH
District Attorney

Zan Colson Brown
Texas Bar No. 03205900
Assistant District Attorney
Gregg County, Texas
101 East Methvin St., Suite 333
Longview, Texas  75601
Telephone: (903) 236–8440
Facsimile:  (903) 236–3701

# TABLE OF CONTENTS

**INDEX OF AUTHORITIES**..................................................................................**2**

**STATEMENT OF FACTS**.................................................................................**3**

**SUMMARY OF THE ARGUMENT** ................................................................**8**

**ARGUMENT**....................................................................................................**9**

**CONCLUSION AND PRAYER**......................................................................**30**

**CERTIFICATE OF SERVICE** ......................................................................**31**

**CERTIFICATE OF COMPLIANCE** ..............................................................**31**

# INDEX OF AUTHORITIES

**Federal Cases**

*Fontaine v. California*, 390 U.S. 593, 88 S. Ct. 1229, 20 L. Ed. 2d 154 (1968).....29
*Gomez v. Beto*, 462 F.2d 596 (5th Cir. 1972) .......................................................18
*Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979) ...........................................................................................................10
*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .................................................................................................. 15, 16, 30

**State Cases**

*Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) ...................................17
*Brooks v. State,* 323 S.W.3d 893, 900 (Tex. Crim. App. 2010) ..............................10
*Caldwell v. State*, 818 S.W.2d 790 (Tex. Crim. App. 1991), ................................29
*Ex parte Adams*, 768 S.W.2d 281 (Tex. Crim. App. 1989)....................................16
*Felder v. State, 848 S.W.2d 85 (Tex. Crim. App. 1992)* ........................................26
*Fernandez v. State*, 830 S.W.2d 693 (Tex. App.—Houston [1st Dist.] 1992, no pet.).....................................................................................................................20
*Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005) ..............................17
*Hernandez v. Stat*e, 988 S.W.2d 70 (Tex. Crim. App. 1999)...................................16
*Johnson v. State,* 691 S.W.2d 619, 627 (Tex. Crim. App. 1984), cert. denied, 474 U.S. 865 (1985) .................................................................................................17
*King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000)....................................10
*Lafleur v. State,* 79 S.W.3d 129, 136-37 (Tex.App.-Texarkana 2002, no pet.) ......16
*Malik v. State,* 953 S.W.2d 234 (Tex. Crim. App. 1997) ........................................11
*McFarland v. State,* 845 S.W.2d 824, 840 (Tex. Crim. App. 1992), overruled on other grounds, *Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994)............17
*Miniel v. State,* 831 S.W.2d 310, 323 (Tex. Crim. App.), cert. denied, 506 U.S. 885 (1992) ...................................................................................................................16
*Moore v. State*, 694 S.W.2d 528, 531 (Tex. Crim. App. 1985)..............................16
*Moore v. State*, 849 S.W.2d 350 (Tex. Crim. App. 1993)......................................29
*State v. Davis*, 988 S.W.2d 68 (Mo. Ct. App. 1999) ..............................................16
*Thompson v. State*, 9 S.W.3d 808, 814-815 (Tex. Crim. App. 1999) ....................17

**State Rules**

Appellate Procedure, Rule 9 (2012).......................................................................32

## STATEMENT OF FACTS

Appellant Sylvester Kelly was charged by indictment on November 30, 2011, with the criminal offenses of aggravated robbery; the date of the offense was alleged as October 30, 2011.  CR 3.

He pleaded not guilty to a jury, but the jury convicted him; he went to the judge for punishment.  CR 48.  The following is a summary of the testimony:

**Ryan Gibson and Steven Bryand**, Longview Police patrolmen, were approached by the robbery victim, **Michael Boyd**, who said he had just been shot at and robbed and that the suspect, wearing a yellow hoodie had walked across the street, Estes Parkway, and entered in a tan Lincoln Town Car. 3 RR 30, 33; 4 RR 15. Gibson walked across to the Town Car, where he found Sylvester Kelly, alone in the rear seat, passenger side. 3 RR 31, 65.  Kelly told Gibson he did not know the owner of the Town Car. 3 RR 65. After identifying himself, Gibson saw Kelly reach down toward the front passenger seat "as if reaching for something or stuffing something." 3 RR 31. The man Gibson arrested was the defendant, Sylvester Grey, also known as Sylvester Kelly and Gibson identified him in Court. 3 RR 32-33. Under the front passenger seat, Gibson found a Glock .40 caliber semiautomatic pistol, serial number APK986, which he identified in court as State's Exhibit 1A. 3 RR 33, 39.  Gibson located the yellow hoodie described by the victim in the rear passenger seat next to where Kelly had been sitting and

Gibson identified it as State's Exhibit 3 A.  3 RR 33-34, 36.  Gibson found the victim's wallet  next to a fence, less than twenty feet from the Town Car. 3 RR 34-35. The victim's Texas ID card was inside, but the wallet contained no money. 3 RR 35. Gibson found the cash missing from the wallet in Kelly's right front pocket. 3 RR 36.  After videoing the wallet, and after he and the victim completed and signed the property release form, Gibson returned the wallet and cash to the victim. SX 7, 3 RR 44-45.

Gibson collected a .40 caliber shell casing from near the victim's car and identified it in court as State's Exhibit 2A. 3 RR 41.

Gibson identified in court the complete video recording he made of the scene was introduced as SX 8 (the suspect's vehicle and the area surrounding it) and SX 9 (the victim's vehicle, and area surrounding it).  3 RR 49-50.  Gibson also identified SX 10-19 a number of still photographs showing the shell casing lying in the grass near the victim's, the yellow hoodie, the victim's wallet, the victim's id card found in the wallet, the damaged driver's side window of the victim's car, the bullet hole in the  window of same car. 3 RR 56-59.

**Michael Boyd,** the victim of aggravated robbery, testified a man in a yellow hoodie first tapped on his driver's side window and then shot through the window, causing Boyd to jump "like between the seats" and "lay still, thinking maybe if he thought I was dead, he wouldn't shoot anymore." 3 RR 91. The robber reached

4

through the shattered window and took Boyd's wallet from Boyd's back pocket. 3 RR 91. Boyd had his Texas ID and $490 in his wallet when it was taken. 3 RR 91-92. State's exhibit 12 was a picture of Boyd's wallet, and State's Exhibit 14 was a picture of Boyd's identification card. 3 RR 92. Boyd's face was cut by the shattering window glass. 3 RR 94. Boyd said State's Exhibit 21 is a picture of Boyd's bloody face after the shot shattered the window. Boyd did not see the shooter's face, as it was shadowed by the big hoodie. 3 RR 95. Boyd had on sunglasses. 3 RR 101. Boyd looked right at the pistol. 3 RR 104. He could not identify Kelly's face as the shooter. 3 RR 105. However, he recognized Kelly as he walked away by stature, "the way he walks." 3 RR 95. Kelly (Gray) and Boyd had gone to elementary school together. 3 RR 96. Boyd did not tell the police that he recognized Kelly's walk. 3 RR 99. He did not feel the need to do so because the police had caught Kelly "red-handed." 3 RR 107.

**Chris Taylor,** a member of the crime scene unit at Longview PD, testified he tried, but failed, to lift any usable prints from the gun. 3 RR 108, 110.

**Aubrey Morrow** testified he had been with Boyd in the car at the time of the shooting and robbery; they were drinking, smoking marijuana, and listening to music. 3 RR 121-122. After the shot, he jumped out of the car, ducked down a minute, and started walking toward the building. 3 RR 123. He thinks he heard Boyd say "he took my wallet." 3 RR 125. He observed somebody walk across the

5

street and enter a "yellowish" car on the passenger side. 3 RR 123-124. Although an officer told Morrow that he needed to talk with him, Morrow took off and walked away, because he was "wanted." 3 RR 124. He could not describe the shooter or describe what he was wearing. 3 RR 125-126.

**John Beene,** firearms expert from the Department of Public Safety in Tyler, testified the shell casing (SX 2) was fired from the Glock pistol (SX1). 3 RR 140.

**Steven Bryand,** the other LPD patrol officer at the scene that night, testified he took the report from the victim, Gary Boyd, who said he had been robbed and the actor was in a brown car across the street. 4 RR 15. Bryand observed the victim's car, with its shattered window and a bullet hole where the bullet had exited the front windshield. 4 RR 15. He testified to the abrasions on Boyd's face. 4 RR 16. He testified that the firearm was capable of causing serious bodily injury or death. 4 RR 16. Bryand did not test Kelly's hands for gunshot residue. 4 RR 22.

Defense counsel asked Kelly on the record if he wanted to testify and Kelly declined. 4 RR 28.

Both sides rested, and after the Court read the charge to the jury, closing arguments began, with Mr. Botto speaking first for the State. In thanking the jury, he stated, "Without you justice is not served today. Without finding Mr. Kelly guilty today justice will not be done." 4 RR 31. In urging them to carefully inspect

the evidence of the firearm and casing, he stated, "And at the end of that inspection and examination, you find Mr. Kelly guilty because he is guilty." 4 RR 33.

The attorney appointed as his appellate counsel filed an Anders brief, specifying that no non-frivolous issues could be raised, and that raising the following issues would be frivolous: the Batson objection during voir dire, the sufficiency of the evidence during guilt innocence, and the punishment phase. This Court agreed.

Kelly filed a pro-se PDR, claiming he could not properly prepare a brief in response to an Anders brief without a complete record. The Court of Criminal Appeals agreed and remanded the case to the Court of Appeals, who arranged for Kelly to have a record, from which he prepared the current Appellant's brief.

Kelly is incarcerated at the Clements Unit, 9601 Spur 591, Amarillo, TX 79107, as number 1802362.

## SUMMARY OF THE ARGUMENT

The evidence was sufficient for a reasonable jury to find all the elements were proved beyond a reasonable doubt, including the element that Kelly was the shooter and thief.

Kelly has not proved that his trial counsel, Rick Hagan was ineffective. His allegations of ineffective assistance of counsel were all fruitless or frivolous. Mr. Hagan could not be expected to make up a defense when there was none.

Kelly has not proved that either his trial counsel or his appellate counsel was ineffective. Solomon's performance was not deficient and Kelly was not prejudiced by Solomon's alleged errors. The State did not knowingly use false or perjured testimony. No pretrial identification as unduly suggestive. There was no reason to raise the issue of a the lack of a photo lineup. The failure to test for gunshot residue was not exculpatory and would not be grounds for reversal. The owner of the car in which Kelly was found had no information relevant to this case. The prosecutors' argument was not improper.

## ARGUMENT

Appellant has no meritorious ground which can be effectively raised on direct appeal. The evidence was sufficient; the record does not support a finding of ineffective assistance of trial counsel or appellate counsel.

Appellant, writing pro se, has filed a brief raising the following issues:

I. There was insufficient evidence of guilt, as the victim and an eye witness failed to identify the accused.

II. Trial Counsel Rick Hagan was ineffective for a number of reasons.

III, IV, V, and VI. Appellate Counsel Vernard Solomon was ineffective for filing an Anders brief. Appellant believes he could have raised several issues.

1) **The evidence was sufficient to identify Kelly as the shooter and to prove all the essential elements.**

   a) **Standard of review: Could a reasonabl**e jury find all the elements of **aggravated robbery beyond a reasonable doubt?**

Appellate courts cannot reverse a defendant's conviction on grounds of insufficient evidence unless no rational jury could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2788-89, 61 L. Ed. 2d 560 (1979). This question is examined in a light most favorable to the verdict. *Id.* Viewing the evidence "in the light most favorable to the verdict" means that the reviewing court is required to defer to the fact finder's credibility and weight determinations because the fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Brooks v. State,* 323 S.W.3d 893, 900 (Tex. Crim.

9

App. 2010). Appellate courts should avoid disturbing a jury's verdict unless necessary as a matter of law. *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000). The State requests this Court share in that deferential spirit by affirming Appellant's conviction based on the evidence presented.

### b) Under a hypothetically-correct jury charge, the evidence was sufficient.

Evidence sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge, which means a charge which "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State,* 953 S.W.2d 234, 239 (Tex. Crim. App. 1997).

Using the hypothetically correct jury charge based on the indictment in the present case, the State had to prove the aggravated robbery by proving that (1) Appellant (2) on or about October 30, 2011, (3) in Gregg County, Texas, (4) during the course of a theft (5) with intent to obtain or maintain control of said property (6) intentionally or knowingly (7) threaten or place M Boyd in fear of imminent bodily injury or death (8) used or exhibited a deadly weapon, a handgun. By all accounts, the only element in question is number one. Who was it that shot out Boyd's window and took his wallet?

Just to touch all the bases, here are citations to the record for each of the other elements:

(2) and (3) Officer Gibson testified that the offense occurred on October 30, 2011, in Gregg County, Texas. 3 RR 29-30.

(4) Boyd testified that the person who shot out his window reached in and removed a wallet full of cash 3 RR 91.

(5) This shooter's intent to obtain or maintain control of said property can be inferred from the testimony that the shooter reached in and took the wallet, that the wallet was discarded, and the $490 was found in Kelly's pocket.

(6) The shooter's state of mind must be inferred from the fact that he actually pulled the trigger and immediately took the wallet and walked away. The damage to the car and to Boyd's face evidenced that a gun had been shot at the car near Boyd's face. SX 11-19, 3 RR 58. The fact that the shooter covered his face with a large yellow hoodie before approaching Boyd's car shows premeditation—and intent. The jury could have inferred that from Kelly's behavior that he intended for Boyd to be placed in fear (acted intentionally) or knew that his acts would place Boyd in fear (acted knowingly) No evidence pointed to an accidental discharge of the gun, disregarding potential results, (acted recklessly). But even if the trigger had been pulled accidentally, "recklessly" could still be inferred.

(7) Boyd testified he was frightened that he would be killed. 3 RR 97. When he was explaining how the wallet was removed from his pocket, he described lying across

11

and between the seats, pretending to be shot, so that perhaps the shooter would not shoot again. 3 RR 91.

(8) The State produced the gun, found at Kelly's feet, which was proved to have shot the shell casing left by Boyd's car. SX 1B, 3 RR 39; SX 2A, 3 RR 41. An expert testified that the shell casing matched one that he had test fired using the gun found at Kelly's feet. SX 22. 3 RR 141.

All the essential elements except the identity of the shooter were uncontested.

That leaves a discussion of the evidence that Kelly was the shooter/thief. All evidence is considered, but it is considered in the light most favorable to the verdict. Could a reasonable jury have found this element beyond a reasonable doubt?

What evidence points to his guilt and what evidence points to his innocence?

He was found with money in an amount described by Boyd.

The wallet described by Boyd containing Boyd's identification was found just a few feet away from the Lincoln.

He was found with the gun and the yellow hoodie described by Boyd.

The ballistics expert reported that the gun found in the car with Kelly matched the casing found by Boyd's car.

Kelly told police he did not know who owned the Lincoln and that he had entered it because he was cold.

He told police he had been dropped off and had never entered the club.

The Lincoln and Boyd's car were within plain view of each other.

12

Boyd and Morrow saw Kelly walk across the street and enter the Lincoln. Neither testified they saw anyone else enter the Lincoln.

The police were there immediately because they had been dispatched there on a different matter—a call that someone inside the club had a gun.

Kelly was still in the Lincoln, and Boyd was able to immediately tell the police that the shooter was in the Lincoln.

Officer Bryand stayed with Boyd and took the description of the yellow hoodie and the black Glock and the stolen property as Officer Gibson walked across the street and observed Kelly attempt to hid the Glock. He apprehended Kelly and found the Glock, the hoodie and the money all within Kelly's reach, and found the wallet discarded just a few steps away from the Lincoln

Boyd could say why he had that much money on him—to pay a bill for his mother. He could not recall at trial where he was going to pay that bill on a Sunday.

Boyd told police and the court that he did not get a look at the shooter's face.

Morrow told the jury that he did not get a look at the shooter's face.

Both saw Kelly leave and get in the Lincoln.

Morrow did not stay to talk with police because he knew he would be arrested. Only one of the officers recalled anyone else standing around.

Morrow testified, however, that he and Boyd were sitting in the car, listening to music, smoking marijuana and drinking. He said a man came to Boyd's car, tapped on the window with a gun, said something like "Give it up," shot through the window. Morrow ducked for cover, then heard Boyd say something like "He took my wallet." When a

13

police officer told Morrow he wanted to talk to him, Morrow walked away to avoid arrest.

The damage to his car and his face support Boyd's story. The amount of money he described, the hoodie he described, and the gun he described all were found near Kelly. Even the wallet containing Boyd's picture identification card was found just steps away from Kelly. These facts support Boyd's story.

The large amount of money found on Kelly's person, the hoodie found on the seat beside him, and the Glock found at his feet point to Kelly's guilt.

The police officers at this scene did not test Kelly's hands for gunshot residue, but they explained that they were neither equipped nor trained to run such tests.

Boyd testified in court that he recognized Kelly's stature and gait as he walked away (having known him since childhood) but did not tell the police he could recognize him because he did not think it necessary. It appeared to him that the police had caught Kelly "red-handed."

Kelly, after being Mirandized, gave a voluntary statement and told Gibson he had not been wearing the hoodie, did not know anything about the gun, was there to try to "hook up" with a girl named Sidney, had just met her, could not give her phone number, did not know who owned the Lincoln in which he was found, had entered the Lincoln to get warm, and had not even gone inside the club. As to the money, he said he had been unemployed for three months, but the money in his pocket was left from his last paycheck. SX 20. He said he made three or four hundred dollars a week when he was working. SX 20.

14

A jury is free to believe or disbelieve any witness' testimony, or believe part of it and disbelieve part of it. This jury convicted Kelly because they believed more of Boyd's testimony than Kelly's recorded statement. They were present and they saw the demeanor of the witnesses. It was their job to discern who was telling the truth. They chose to believe Boyd's testimony because the physical evidence found and the location where it was found all went to support Boyd's version of the facts. Any reasonable jury could have found every essential element beyond a reasonable doubt.

**2) Kelly has not proved that his trial counsel was ineffective.**

### a) Standard of review: Did trial counsel's performance fall below an objective standard of reasonableness and would the outcome of the trial be different but for the allegedly deficient performance?

Claims of ineffective assistance of counsel are to be evaluated under the standard of review enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); s*ee also, Hernandez v. State*, *State v. Davis*, 988 S.W.2d 68, 70 (Mo. Ct. App. 1999) (adopted the *Strickland* test). The standard of review has two prongs. *See Strickland*, 466 U.S. at 687–88. Under the first prong, Appellant must show that his counsel's performance was deficient, or that counsel's representation fell below an objective standard of reasonableness. *Id.* ; *LaFleur v. State*, 79 S.W.3d 129, 136 (Tex. App.—Texarkana 2002, no pet.). A claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland*, 466 U.S. at 686.

15

The second prong requires Appellant to prove that his counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687–88. To demonstrate prejudice, Appellant must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* ; *LaFleur*, 79 S.W.3d at 137. The failure to satisfy one prong negates a court's need to consider the other. *Strickland*, 466 U.S. at 694.

Appellant bears the burden of proving ineffective assistance by a preponderance of the evidence. *Ex parte Ex parte Adams*, 768 S.W.2d 281, 287 (Tex. Crim. App. 1989)–88 (Tex. Crim. App. 1989); *Moore v. State*, 694 S.W.2d 528, 531 (Tex. Crim. App. 1985). Trial counsel's performance is not to be judged with the benefit of hindsight. *Miniel v. State*, 831 S.W.2d 310, 323 (Tex. Crim. App. 1992)(Tex. Crim. App.), *cert. denied*, 506 U.S. 885 (1992).

In reviewing Appellant's claim of ineffective assistance of counsel, the Court considers the totality of the evidence before the jury or court. *McFarland v. State*, 845 S.W.2d 824, 840 (Tex. Crim. App. 1992), *overruled by Bingham v. State*, 915 S.W.2d 9 (Tex. Crim. App. 1994). The review of counsel's performance should be highly deferential. *McFarland*, 845 S.W.2d at 824. There is a presumption that the attorney rendered effective representation; Appellant has the burden of rebutting that presumption. *Id.* The record must affirmatively support Appellant's claims of ineffective assistance of counsel. *Johnson v. State*, 691 S.W.2d 619, 627 (Tex. Crim. App. 1984).

On direct appeal, the record has usually not been sufficiently developed to enable an appellate court to adequately determine whether the appellant was provided ineffective

16

assistance of counsel. *Thompson v. State*, 9 S.W.3d 808, 814-815 (Tex. Crim. App. 1999). A claim of ineffective assistance is better pursued by way of habeas corpus, with which there is a better opportunity for the record to have been developed regarding trial counsel's reasons for his or her actions. *See Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005); *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002).

**b) Appellant's claims of trial counsel's ineffective performance are not supported by the record.**

**i) There were no other occupants of the car in which Kelly was arrested at the time he was arrested. Any attempt to interview them would have been fruitless.**

Appellant claims that his trial counsel failed to find and interview the driver and passenger of the car in which he was arrested. Officer Gibson testified that Kelly claimed that night that he didn't know who the car belonged to, and that he had entered it because he was cold. 3 RR 64-65. Kelly was alone in the car when apprehended. 3 RR 65. Although counsel got an affirmative answer from Patrolman Gibson when he asked if he was approached by a man who said, "Hey, that's my car," the officer did not ever identify the man. 3 RR 66-67. Counsel asked if his name was Bertrand Snoddy, but the officer did not know. The record supports that Counsel may have known the owner's name, but does not support Kelly's assertion that counsel did not find and interview him before trial. The record does not support that there was a passenger. The record does not support

that counsel's failure to find and interview them caused the outcome of the trial to be any different. There is nothing in the record to indicate that the "potential witnesses" observed anything about the offense. This is a frivolous claim.

Later, at page 8 of his brief, the appellant adds a citation to a case regarding an attorney was found ineffective for failure to "pursue appellant's request to investigate a named alibi witness." *Gomez v. Beto*, 462 F.2d 596 (5th Cir. 1972). There is nothing in this record to indicate that the owner of the vehicle in which Kelly was found even knew Kelly, much less that he would provide an alibi. Nothing in the record shows what the trial counsel knew or what trial strategy he was following. Sound trial strategy is presumed, and the appellant has failed to rebut the presumption.

### ii) Hagan was unaware of the chain of custody regarding the currency.

The brief record excerpt cited by the appellant does not show that the counselor was unaware of the chain of custody. 3 RR 48, ll. 4-14. It shows only that the property release form which documented the return of the wallet and currency to Michael Boyd was introduced as State's Exhibit 7A, and that Mr. Hagan did not object. There was nothing objectionable to the evidence and an attorney is not obligated to make frivolous objections.

18

### iii) The record does not show that Hagan failed to conduct pretrial discovery.

The record does not show that Hagan failed to conduct pretrial discovery. The Michael Morton Act went into effect on January 1, 2014, well after Kelly's trial, but before those major changes, Gregg County District Courts established standing orders to cover pre-trial disclosure, pre-trial and trial discovery, expert witnesses, pre-trial motions and settings, trial disclosures, and standing in-limine orders. These orders were adopted as a local rule by the 124th and 188th District Court Judges, Alfonso Charles and David Brabham on February 25, 2011, and is attached hereto as Exhibit A. Nothing in the record of this case shows that the defense counsel and prosecutors failed to comply with the standing orders.

### iv) Hagan did not need to file a motion in limine related to the testimony of Aubrey Morrow.

Appellant claims at page 8 of his brief that the record does not show that Morrow was actually an eye witness. He relies on Officer Bryand's testimony that although he was aware of one other gentleman standing around, he did not talk to any other witnesses besides Michael Boyd. 4 RR 17. Morrow's testimony explains that seeming contradiction when he said he heard an officer ask him to stay and answer some questions, but Morrow, being "wanted," walked away. 3 RR 124. Morrow did testify that he had been in the car when the shot occurred. 3 RR

19

124. Appellant has not cited to any statute or case which would prohibit the testimony of Aubrey Morrow. The case he did cite was *Fernandez v. State*, 830 S.W.2d 693 (Tex. App.—Houston [1st Dist.] 1992, no pet.). In *Fernandez,* the attorney was found ineffective (1) for calling the defendant's wife as a witness, thus subjecting her to cross-examination by the State, when the State could not have called her to testify because of the spousal immunity, and (2) for failing to object to particularly damaging hearsay testimony. This case is not applicable to the facts at hand because Morrow was not married to Kelly, and because Morrow's testimony was not hearsay.

Such a motion in limine would have been frivolous. Just because a piece of evidence or a witness' testimony is harmful does not mean it is inadmissible.

> **v) Hagan failed to prevent testimony from an eye witness; failed to request an instruction to disregard the testimony or request a mistrial based on the testimony.**

Again, the appellant has failed to show that Morrow's testimony was objectionable. A defense attorney cannot prevent testimony if the testimony is not objectionable. Only a judge can rule it inadmissible. If the testimony is not objectionable, there is no need for an objection, a request for instruction to disregard, or a request for a mistrial. This alleged failure does not prove deficient performance or prejudice.

20

### vi) Hagan's failure to raise a viable defense was based on the fact that there was no viable defense.

Appellant asserts that if an attorney fails to assert a viable defense, the appellant does not have to prove it would be successful. See Appellant's Brief, at 8. He must, at the very least, however, assert on appeal that some defense existed. Mr. Kelly was caught red handed immediately after the robbery across the street from the robbery, with a gun that was tied to the robbery by matching the casing; he was caught with a large amount of money; he was caught with a hoodie that had been described by the victim; he had thrown the wallet containing the victim's identification not far from where he was found, and he was found in a car, on the left side, when the victim had pointed to the car and said he entered the left side. What possible defense is there? Were these all simple coincidences? Mr. Hagan was left in the unenviable position of having to rely on his cross-examination skills alone. There was no alibi; there was no other person who confessed; there was no other person whom to accuse. He attempted to raise reasonable doubt with his questions, but the facts were stacked against this defendant.

Appellant has not proved his counsel's performance fell below an objectively reasonable standard or that the allegedly substandard performance caused his conviction. He has failed to prove ineffective assistance of trial counsel.

21

3) **(In response to Appellant's Points III, IV, V, and VI)  Kelly has not proved that his appellate counsel was ineffective.**

   a) **Standard of review: Did trial counsel's performance fall below an objective standard of reasonableness and would the outcome of the trial be different but for the allegedly deficient performance?**

   The same standard of review applies to claims of ineffective appellate counsel that applies to claims of ineffective trial counsel.

   b) **Appellate Counsel Vernard Solomon was not ineffective for filing an Anders brief.**

   The appointed appellate counsel Vernard Solomon filed an Anders brief in which he took one point from each phase of the trial and explained why that point would have been frivolous to argue.  His arguments persuaded the Sixth Court of Appeals that there was no non-frivolous argument to make in an attempt to get a reversal.   Appellant now lists, in his points III, IV, V, and VI, a number of complaints that should have been raised on direct appeal. These complaints about Solomon's failings are all meritless, but will be discussed individually.

   i) **The State did not knowingly use false or perjured testimony.**

   Appellant's allegation that the State knowingly used false and perjured testimony from Aubrey Morrow and failed to correct it is unfounded. Morrow stated he was a witness to the robbery.  Neither Gibson nor Bryand interviewed him. Neither Gibson nor Bryand was present at the time of the robbery.  They

22

came up soon thereafter.  Morrow said that an officer indicated he wanted to talk to him, but Morrow, being "wanted," did not want to be interviewed, because he knew that he would be arrested.  He therefore walked away before the officers could talk to him.  This explains why the officers were not able to put him in their report.  Bryand did recall another gentleman standing around, but did not interview him. 4 RR 17.  Bryand's testimony and Morrow's are not directly in conflict. This record does not show that the State knowingly elicited false testimony.

### ii) (Appellant's Issue IV) No pretrial identification was unduly suggestive.

Appellant's claim that he was subjected to unduly suggestive pretrial identification is unfounded. This is not a case of finding a suspect at another location and bringing him back for identification.  This man never left the sight of the victim.  Boyd watched him cross the street and enter the car.  Then he told police which car he was in, on which side of the car,  and what he was wearing. Office Gibson found him where the victim said he was, sitting beside the yellow hoodie. A claim of unduly suggestive pretrial identification would have been frivolous.

### iii) (Appellant's Issue V) Record does not support Kelly's claim that the investigation was "contrived" or that the witnesses were obligated to agree with police.

Appellant's allegations that the robbery investigation was "contrived" and that witnesses Boyd and Morrow were obligated to agree with the police are

23

without foundation in the record. The robbery investigation was not contrived. It was just easy. Boyd admitted he never saw the face of the shooter, but he did see him walk away. He thought he recognized the man in the yellow hoodie as his childhood schoolmate because of his stature and the way he walked. He maintained visual contact with the car he saw Kelly enter until he could point it out to police and the police found Kelly there with the gun and the hoodie, Boyd's cash, and Boyd's wallet tossed not very far away.

### iv) Appellate counsel had no reason to object to the lack of a photo lineup.

Applicant's allegation that his counsel should have raised the issue that the police arranged no photographic lineup is not supported by the record. Such an issue would have been frivolous. No photographic lineup was required and would have been pointless. Boyd said he did not see the face. A photograph would not have portrayed the only identifying characteristics Boyd claimed to have been able to use to identify Kelly—his stature and gait.

### v) The failure to test for gunshot residue was not indicative of Kelly's innocence, and would not be grounds for reversal.

Applicant alleges on page 13 that his counsel should have raised the police officers' failure to perform an "atomic absorbtion" test to find gunshot residue. His trial counsel did bring up this failure at the trial. 4 RR 21-22. The answer from Officer Bryand was that the ordinary patrol officer was not equipped or trained to perform such a test in the field. 4 RR 22-24.

24

**vi) There was no basis in the record for a belief that a statement from the car's owner would have been relevant to this case.**

Applicant's allegation that the State didn't try to get a statement from the car's owner or identification from the driver and passenger is an attempted "rabbit trail." Kelly told Officer Gibson, at their first encounter, that Kelly did not know the owner of the car; he had just entered the car because he was cold. 3 RR 65. There is nothing in the record that would have led officers to believe the owner had any knowledge of the robbery. The existence of a passenger in the Town Car has no basis in the record. The fact that the owner later approached the officer saying "That's my car" does not connect the owner to the robbery. That man may have been a guest at the club that night, but there is nothing in the record to show any connection to the robbery. The gun was in a location in the Town Car near where Officer Gibson saw Kelly make a furtive gesture. Even if there had been other occupants, the gun was found at Kelly's feet, so the affirmative link to Kelly would have been strongest. There is no reason to bring up on appeal a connection that is not supported by the record.

**vii) The prosecutors engaged in no improper argument. To argue that they did would have been fruitless and frivolous.**

Applicant alleges in his sixth issue that the prosecutor engaged in improper argument when Mr. Botto said, "because he is guilty"; "without a guilty verdict, justice will not be served"; "we apply our life experience to it, and then we know that Mr. Kelly is guilty"; and when Ms. Garrett suggested Boyd didn't identify Kelly because he was scared to testify against Kelly.

Applicant correctly states that there are four permissible areas of final argument.

25

"[T]here are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement." *Felder v. State,* 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992) (internal citations omitted.)

But the *Felder* opinion continued: "An argument which exceeds these bounds is error; however, it only becomes subject to reversal if, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused, into the trial." *Id.*

Mr. Botto began by thanking the jury for their service, and added, "Without you, justice is not served today. Without finding Mr. Kelly guilty today justice will not be done." 4 RR 31. This statement arguably is just thanking the jury and emphasizing their importance, but also is a plea for law enforcement.

When Mr. Botto told the jury they could take the gun and the shell casing and other evidence back to the jury room, he was encouraging them to pick up each item and handle it. He said, "You get to inspect it and examine it. And at the end of that inspection and examination, you find Mr. Kelly guilty because he is guilty." 4 RR 33. One can easily argue that Mr. Botto was proposing reasonable deductions from the evidence when he said, "Your life experience goes back there with you. Right? We don't become some conspiracy theorists and try to make

26

things up back in that room. We take what we heard in this courtroom, we apply our life experience to it, and then we know that Mr. Kelly is guilty." It was not extreme or manifestly improper, and it did not violate any statute or inject any new, harmful facts. It was not a statement of Mr. Botto's personal belief. It was an appropriate closing statement. He did not say, "He's guilty because I believe him to be guilty." Mr. Solomon, appellate defense counsel, found nothing to argue about Mr. Botto's closing statement because there was no improper argument.

When Appellant complains that the prosecutors alluded to the money that was not entered into evidence, he seems to forget State's Exhibit 7A, the property receipt signed by both Michael Boyd and Officer Gibson. Although the wallet and the cash were returned to Boyd that evening, there was a record made of their existence and that record was introduced. Talking about the wallet and the cash was not improper argument; it was merely a part of summary of the evidence.

When Ms. Garrett suggested that Mr. Boyd might have been afraid to identify Kelly, she was explaining his reluctance to say he identified him by his stature and gate, and she was further reminding the jury of his explanation for why he did not tell the police—Boyd thought that since the police caught Kelly red handed, Boyd would not have to identify him. 4 RR 50-51.

Ms. Garrett was responding to Mr. Hagan's argument when she talked about

27

Boyd's lies. Mr. Hagan first called Boyd a liar, reminding them that Boyd had lied about why he was arrested a few years ago. Garrett had recalled Boyd to the stand and asked him to tell the truth, admitting the lie. 3 RR 115. In closing argument, Garrett had to talk about that lie and persuade the jurors to believe the rest of his testimony. Her "bolstering" of his testimony added no new facts, her argument was based on the evidence. She minimized the lie he told and she corrected, saying that it was not really related to the issues at hand. She reminded the jurors of his demeanor when he identified him by his stature and gait. And finally, she reasoned that if he was intentionally lying just to get Kelly in trouble, he would have lied and said, "I saw his face, and it was Kelly." This is a plea for a reasonable deduction from the evidence, not a statement of her personal opinion.

Appellant also complains that Mr. Botto called attention to the lack of evidence that only the defense could have supplied. Only Kelly knew the name of the woman who allegedly dropped him off at the club. The cases cited in Appellant's brief are *Fontaine v. California*, 390 U.S. 593, 88 S. Ct. 1229, 20 L. Ed. 2d 154 (1968); *Moore v. State*, 849 S.W.2d 350 (Tex. Crim. App. 1993); and *Caldwell v. State*, 818 S.W.2d 790 (Tex. Crim. App. 1991), *overruled by Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995). In each of those cases, the prosecutor commented on the defendant's failure to testify, or his failure to show

remorse, thereby violating his constitutional privilege against self-incrimination. Kelly's complaint is not that the prosecutor commented on his failure to testify, but on Mr. Botto's comment that Kelly had the authority to subpoena witnesses but failed to call the woman who he claimed dropped him off at the club. This is not a comment on his failure to testify.

Although Kelly did not testify, he did make a statement to police at the time of his arrest. In the excerpt of Mr. Botto's argument that Kelly references, Botto mentioned that statement and told the jury to ask three questions during Mr. Hagan's closing statement: Where is the mystery girl? Where is the mystery shooter? Why did Kelly have all that money? 4 RR 39-40.

In his statement to police, Kelly had said that he had been dropped off by a female, and he had never entered the club. Mr. Botto suggested a reasonable deduction from that statement would be that Kelly had been there the whole time, must have seen the shooter, must have seen somebody put the hoodie and the gun in the car with him. These questions were not a comment on Kelly's failure to testify; they were a comment on the holes in the story he told to police. Such questions are proper in that they request the jury to look at the evidence and draw reasonable conclusions.

The arguments that appellant complains of are not extreme or manifestly improper. They do not violate a statute, and they do not inject new, harmful facts

into the trial. Mr. Solomon recognized this and elected not to raise the issue of improper argument. He committed no error in so doing.

**viii) Conclusion: Appellant's claim of ineffective appellate counsel does not meet the *Strickland* standard.**

Appellant has not met the burden of proving deficient performance or prejudice on the part of his trial counsel or his appellate counsel. He has not rebutted the strong presumption that every decision of his counsel was based on sound legal strategy.

## CONCLUSION AND PRAYER

All of Kelly's claims are meritless. The evidence was more than sufficient. Mr. Hagan's representation was effective. Mr. Solomon's Anders brief was correct, and the Court of Appeals opinion was accurate. There were no non-frivolous issues.

The State therefore prays that the trial court's judgment be affirmed.

Respectfully submitted,

/s/ *Zan Colson Brown*
Zan Colson Brown
Texas Bar No. 03205900
Assistant District Attorney
101 East Methvin St., Suite 333
Longview, TX 75601
Telephone: (903) 236–8440
Facsimile: (903) 236–3701

30

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above and foregoing has been forwarded to the pro se appellant by first class mail.

Sylvester Kelly, # 1802362
Clements Unit
9601 Spur 591
Amarillo, Texas 79107

this  4th day of March, 2015.

/s/ *Zan Colson Brown*
Zan Colson Brown
Assistant District Attorney

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document complies with Texas Rules of Appellate Procedure, Rule 9 (2012) regarding length of documents, in that exclusive of caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix, it consists of 7205 words.

/s/ *Zan Colson Brown*
Zan Colson Brown
Assistant Criminal District Attorney